**SO ORDERED.**

**SIGNED this 22 day of October, 2008.**

_____
**Randy D. Doub
United States Bankruptcy Judge**

_____

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NORTH CAROLINA
WILSON DIVISION

IN RE:                                                          CASE NO.

JEDI ORIENTAL, LLC                                              07-03976-8-RDD

      DEBTOR

ORDER CONVERTING CASE FROM CHAPTER 11 TO CHAPTER 7

Pending before this Court is the Motion of the Bankruptcy Administrator to Convert Debtor's Chapter 11 Case to Chapter 7 pursuant to 11 U.S.C. § 1112 (b) (the "Conversion Motion"), the Response in Support of the Conversion Motion filed on behalf of Robert Arogeti, as Successor Trustee to James Arogeti for Habif, Arogeti & Wynne, P.C. Retirement Plan ("Arogeti"), the Response to the Conversion Motion filed by Jedi Oriental, LLC (the "Debtor"), and the Supplemental Response of the Bankruptcy Administrator. A hearing was held in Wilson, North Carolina on October 7, 2008.

The Bankruptcy Administrator requests that the Court convert this case based on the Debtor's failure to timely file monthly reports; the substantial and continuing losses to or diminution of the estate; the gross mismanagement of the estate; and the absence of a reasonable likelihood of reorganization.

The Debtor asserts that it has expended substantial efforts attempting to develop the property and that it is seeking post-petition financing in order to complete development of the project. In addition, the Debtor alleges that its largest creditor, Arogeti, does not hold a secured claim, but in fact, the Arogeti claim is entirely unsecured. Given the fact that the Debtor has made, what it believes to be significant progress in the past few months, the Debtor asserts that conversion of the property is not in the best interest of creditors or the estate.

At the hearing on the Conversion Motion, the Debtor offered testimony from Matthew Brunn, a principal of the Debtor; Christopher Brady, a principal of the Debtor; and Ralph S. Jarvis, PE, PLE, and President of Jarvis Consulting, Inc.

The testimony presented by the Debtor focused on the efforts it has made, with the assistance of Jarvis Consulting, Inc. ("Jarvis"), to develop the property over the past four years. Both the Debtor's principals and Mr. Jarvis testified extensively about the roadblocks and development delays the Debtor encountered as a result of the lack of sewer availability. The Debtor indicated that because of the ongoing problems related to accessing or constructing a sewer system, additional capital is required to complete the project. Mr. Brunn and Mr. Brady testified that the Debtor had been in negotiations with Arogeti to obtain additional funds until August 2008. At that time, Arogeti withdrew from the negotiations and the Debtor's principals testified that they were now exploring alternative funding options. As evidence of its potential funding alternatives, the Debtor presented the Court with an unsigned, contingent term sheet from Georgia Capital, LLC setting forth potential loan terms. *Exhibit G.*

Ralph S. Jarvis testified in greater detail regarding the problems the Debtor has encountered with accessing or building a sewer system. A primary roadblock for the Debtor was that Bay River

Sewer Authority ("BRSA") refused to sell the Debtor any taps for its sewer system. Mr. Jarvis stated that during the past summer, the BRSA restructured itself and offered to let the Debtor purchase 53 taps at $12,500.00 each. The only documentation of this offer was an unsigned letter. To Mr. Jarvis' knowledge, he did not believe that BRSA would allow the Debtor to pay for the sewer taps over a period of time. Mr. Jarvis also testified as to the Debtor's additional efforts over the past three years to acquire and/or provide its own sewerage system. Each of those efforts proved to be unsuccessful.

With respect to the status of the project, Mr. Brady, Mr. Brunn, and Mr. Jarvis all addressed the revision of the development plans that would allow for additional lots. By increasing the number of lots, the Debtor would be able to reduce the lot prices; thereby, making the lots more attractive to potential purchasers. To date, the revised plans have not been submitted to the county for approval.

At the present time, none of the lots are suitable for sale. Mr. Brady stated that the Debtor had several lot reservations but no deposits had been received. Mr. Brady did not provide any specific testimony as to when the reservations were taken or whether these reservations were based on the original recorded plat. Furthermore, Mr. Brady did not provide any documentation of the alleged reservations. Based on the operating reports filed by the Debtor, since the filing of the case, there has been no income generated from the project.

Section 1112(b)(1) of the Bankruptcy Code was amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA") and states:

> (1) Except as provided in paragraph (2) of this subsection, subsection (c) of this section, and section 1104(a)(3), on request of a party in interest, and after notice and a hearing, absent *unusual circumstances* specifically identified by the court that establish that the requested conversion or dismissal is not in the best interests of

3

> creditors and the estate, the court **shall** convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, if the movant establishes *cause*.

(emphasis added). In this case, there are no unusual circumstances which would establish that conversion is not in the best interests of the creditors and the estate. Under subsection (2) of § 1112(b), the unusual circumstances which would warrant the court's not granting the motion to convert:

> (A) there is a reasonable likelihood that a plan will be confirmed within the timeframes established in section 1121(e) and 1129(e) of this title, or if such sections do not apply, within a reasonable period of time; and
>
> B) the grounds for granting such relief include an act or omission of the debtor other than under paragraph (4)(A) ---
>
> (i) for which there exists a reasonable justification for the act or omission; and
> (ii) that will be cured within a reasonable period of time fixed by the court.

In this case, it is doubtful that Arogeti would ever vote to confirm any proposed plan. Counsel for Arogeti stated that his client has lost all confidence in the principals and the Debtor. Arogeti holds the only secured claim and a $1.9 million unsecured claim. Arogeti is the largest creditor in this case.

At the time of the hearing, the Debtor failed to present any concrete evidence of debtor-in-possession financing or specific financing terms. For example, Mr. Brady was questioned how the Debtor intended to cover the cost of the 53 sewer taps, as the amount set forth in the Georgia Capital LLC proposal was insufficient to cover such amounts. Mr. Brady stated that the terms were not firm and that he intended to continue negotiations. After a recess, Mr. Brunn testified that during the break, Georgia Capital LLC verbally agreed to increase its funding from $1.0 million to include any amounts needed to purchase all 53 sewer taps; thereby increasing the loan amount by approximately

4

$500,000 to $670,000. Such a drastic change to the terms on such short notice, places the credibility of the term sheet into question. Furthermore, the term sheet specifically states that funding from Georgia Capital LLC is contingent based upon its due diligence assessment.[1] Consequently, there is no obligation for Georgia Capital LLC to move forward with the transaction after its due diligence period.

Furthermore, the Georgia Capital LLC term sheet proposed that it would require first lien positions on both the Johns Island project in South Carolina and the Fripp Point Road project located on Fripp Island in South Carolina if the loans were cross collateralized. The granting of the first lien positions would require the priming of liens on property that is not property of the estate and may not be subject to this Court's jurisdiction. Given the contingencies, the impact on the property that

---

[1] In fact, the term sheet contains a number of conditions regarding the lender's review and approval including:
   (a) Full copy of loan agreements encumbering all collateral with Arogeti Family Trust;
   (b) Detailed sources and uses of funds required at closing and funds spent to date;
   (c) Complete copies of all documents associated with bankruptcy filings;
   (d) Copy of LLC and related documentation for LLC that will hold title to the Property;
   (e) Name of each member of LLC, ownership interest, and amount invested;
   (f) Corporate chart - Parent entity and the operating entity for the LLC;
   (g) Approved Site Plan, and full set of engineered plans the development;
   (h) Title Commitment with listed Exceptions;
   (i) Survey;
   (j) Phase I Environmental Report;
   (k) Appraisal;
   (l) Zoning Information;
   (m) Source of Water and Sewer;
   (n) Full Copy of approved zoning plans; complete with zoning conditions;
   (o) Copy of the land disturbance permit for the development of the property (if applicable or final plat);
   (p) Project Financial Projections - to reflect historical sales and development with detailed footnotes to project sellout;
   (q) Current Financial Statements in Georgia Capital Format signed by Guarantor;
   (r) Engineering Reports including soil tests;
   (s) Market Reports and Feasibility Reports;
   (t) Well defined sales and exit strategy; and
   (u) Such other items as the lender may required.

is not part of the bankruptcy estate, and the changing term sheet, financing by Georgia Capital LLC does not appear to be feasible and is not a viable proposal that may allow the Debtor to confirm a plan. Without the financing, the principals themselves stated that they would not be able to develop the project.

The Debtor asserts that unusual circumstances exist with respect to the sewer issues. The principals of the Debtor testified that the reason the development of the land has been delayed is because of the Debtor's inability to construct or hook onto a sewer system. Yet, both principals testified that at the time the Debtor purchased the land, more than four years ago, they knew the property could not be developed without a sewer system. Since then, even though the Debtor has attempted to resolve the sewer issues, they have been unable to do so and now propose spending $662,500 for the 53 taps from BRSA. Given the principals' purported experience in land development, they should have been aware of the risks involved with sewer systems. Consequently, the Debtor has failed to establish any unusual circumstances to forestall conversion if cause is established.

Cause exists to convert this case from chapter 11 to chapter 7. The BAPCPA amendments to 11 U.S.C. § 1112(b)(4) set forth specific examples of cause, including but not limited to gross mismanagement of the estate; substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation; the unexcused failure to timely file monthly reports; the failure to timely provide information requested by the Bankruptcy Administrator; and the failure to file a disclosure statement or confirm a plan within the time fixed by this title or by order of the court.

The Court finds that the following facts represent gross mismanagement of the estate and warrant cause for the conversion of this case:

1. The Debtor's failure to timely file monthly reports during the pendency of this case.

2. The Debtor's failure to employ Jarvis Consulting, Inc. as a professional under Section 327 of the Bankruptcy Code at the beginning of the case; while in the meantime, Jarvis continued to provide services for the Debtor without having its employment approved by the court.

3. The Debtor's lack of foresight and planning related to the purchase of the 53 taps. There are inconsistencies between the letter from BRSA authorizing the purchase of 53 sewer taps as compared to the purchase of only 15 taps shown on the Revenue and Cost Analysis provided to the Court. *Exhibit J*. Furthermore, Ralph Jarvis testified that the BRSA's policy required the purchase of all taps at the same time. The purchase of the additional taps will add an additional $570,000 to the proposed revenue and cost analysis proposal. As previously stated, the principals' testified that Georgia Capital LLC would fund the additional amounts to purchase the remaining taps but there is no written commitment supporting this proposition.[2]

4. The new plat proposal appears to be a townhouse-like concept. Neither principal provided comparative sales figures for this type of development in the respective area. In addition, the two principals could not agree as to the minimum square foot requirements for the new homes. Mr. Brady testified that the minimum square footage would be 2200 square feet and Mr. Brunn stated that the size would be 1200 square feet.

---

[2] Georgia Capital LLC also requires a $15,000 application fee. The Debtor has no funds available for the payment of this fee. Mr. Brady testified that a "hiking friend" has agreed to pay the application fee. There is no testimony or evidence to corroborate this assertion. Funding for the Georgia Capital LLC loan is contingent based on its feasibility study.

5. To date, the Debtor has not prepared any declarations of covenants, conditions, or restrictions. The Debtor has not incorporated a homeowners' association or drafted any proposed by-laws for the townhouse-like development. Furthermore, the Debtor has not engaged a law firm to prepare such necessary documentation.

6. The Debtor has not submitted the revised "townhouse-like" plans for agency review or approval.

7. With respect to Mr. Brady and Mr. Brunn, both are involved in other development projects, including Jedi Fripp and Jedi Johns Island in South Carolina. Neither project has been successful. In fact, both developments are allegedly in default under the terms of their financing agreements.

8. Mr. Brunn is currently an individual debtor in a Chapter 7 case in the United States Bankruptcy Court for the Northern District of Georgia. Mr. Brady is presently a Chapter 11 debtor in a bankruptcy case pending in the same district. A review of the principals' Statements of Financial Affairs reflects that neither individual has earned any income from land development or land sales since 2006.

9. Furthermore, Mr. Brunn and Mr. Brady admitted that prior to the filing of their individual bankruptcy petitions, they transferred a portion of their interest in the Debtor to Wayne Brady, father of Christopher Brady. Based upon the testimony at the hearing, the interests have subsequently been transferred back to the principals.

10. Mr. Brady testified that he visited the development site approximately 6 times during the past 6 months. Although Mr. Brunn testified that he visited the site more frequently, both

principals reside in Atlanta, Georgia and have no employees at the site in rural Pamlico County, North Carolina. Ralph Jarvis, the Debtor's engineer, testified that he is regularly at the site.

11. Neither of the principals have made significant investments or capital contributions in to the Debtor. Mr. Brady alleged that their interest is "sweat equity," yet Mr. Brady visited the site 6 times during the past 6 months. From its inception, this project was under capitalized.

12. With respect to the sewer issues, Jedi Oriental, LLC has owned the property since 2004 and knew at that time of purchase that the property did not "perk" for septic tanks. For almost four years, the Debtor has been unable to reach a solution regarding a septic system. Although it appears that BRSA is willing to sell the Debtor 53 taps, the Debtor failed to present a signed letter authorizing such a purchase. Even if BRSA allowed the Debtor to purchase the 53 taps, the funding for other capital improvements, permits, and the installation of the sewer is not certain.

13. The projections submitted to the Court by the Debtor purport to have the lots ready for sale within 6 months with dramatic sales within the next 12 months. Given the state of the current economy and the real estate market, this forecast is completely unrealistic. After four years of work, the Debtor does not have the plat delineating the lot lines approved.

14. Based on the testimony of Mr. Jarvis, engineering fees to date exceed $80,000 and he projects that the total engineering fees for the project will be $350,000. There are numerous permits that the Debtor must obtain through a fast track process. In addition to the timing factor, permits such as the CAMA permit, the Riparian Buffer permit, and the Coastal Resources permit, have significant costs attached to them.

15.  Lastly, Mr. Jarvis, who possesses years of experience in engineering and development projects, expressed reservations about the abilities and experience of the Debtor's principals, Christopher Brady and Matthew Brunn, to complete the development of the project.

Based on these factual findings, cause exists to convert this case to Chapter 7 based on the principals' gross mismanagement of the estate.

In addition, cause exists to convert this case on the grounds that there is a substantial or continuing loss or diminution of the estate and the absence of a reasonable likelihood of rehabilitation:

1.  Arogeti allegedly holds a secured lien against the property at issue.  Default interest and fees continue to accrue while the Debtor attempts to push forward in its efforts to resolve the sewer issue.  The Debtor has had four years to resolve the sewer issue and though, it may be one step closer today, the Debtor has not definitely secured the required additional financing. The Debtor has no operating funds and costs continue to rise.  Without the additional financing, the Debtor is unable to complete the project.

2.  Furthermore, Arogeti has no confidence in the abilities of Mr. Brunn and Mr. Brady to develop to property.  Even the Debtor's engineer, Ralph S. Jarvis, testified that he has concerns regarding their abilities. Neither individual has the necessary experience or financial backing to successfully rehabilitate the Debtor.

3. The Debtor proposes to sell most of the lots within one year.  This projection is unrealistic given the present state of development.  At the present time, the Debtor does not have a firm, non-contingent financing offer; the sewer lines are not installed; the revised plans have not been approved by the requisite agency; and the Debtor has not obtained the necessary permits.  It is

unrealistic to believe that in today's real estate market that the Debtor would be able to complete the development and liquidate its inventory within one year. In the meantime, interest, administrative expenses, and costs continue to accrue.

  4. The principals of the Debtor stated that they could cut back on amenities and other projects in order to save money and finish the project on a shorter time frame. However, it is the family area, the gated entrances, and the other perks that will assist the Debtor in the marketing and selling of the lots. It is unforeseeable that anyone would be interested in purchasing a lot at a premium price when the Debtor is only offering limited amenities and resources. Consequently, the Court does not see this as a viable option to reduce the costs and comply with a timeline for development.

  5. The Debtor admits that it will likely need an additional $1.6 million to develop the property. However, even if the Debtor had the funds available today, the sheer amount of work that must be done before the Debtor can even begin to market the lots is daunting. In addition, once completed, the Debtor undoubtedly will incur substantial marketing and sales costs. Even with these costs and in this declining market, the Debtor believes that it can sell the majority of its lots within one year. The Court is not persuaded that the Debtor or it principals have the ability to do so and finds that the Debtor is not likely to be rehabilitated.

  Cause further exists to convert this case based on the Debtor's unexcused failure to timely file monthly reports and its failure to timely provide information requested by the Bankruptcy Administrator. Christopher Brady failed to provide any viable excuse as to why the Debtor's monthly reports have been late on several occasions since the filing of this case.

Lastly, cause also exists under 11 U.S.C. § 1112(b)(4)(j) on the basis that the Debtor failed to confirm a plan within the time fixed by this title or by order of the court. This case was filed on October 22, 2007. Even though the Debtor has filed multiple disclosure statements and plans, to date, no plan has been confirmed after exactly one year since the filing of the case.

Based upon the foregoing factual findings, cause exists to convert this case from a chapter 11 to a chapter 7. Pursuant to section 1112(b)(1), Congress has taken the discretion away from the court if cause is established and no unusual circumstances are present. Based on the testimony given at the hearing, the Debtor has failed to establish that such unusual circumstances exist. Therefore, cause is established based on all of the above, and absent unusual circumstances specifically identified by the court that establish that the requisite conversion is not in the best interest of creditors and the estate, this case shall be converted to a chapter 7.

Based on the foregoing, the Motion to Convert to Chapter 7 is **ALLOWED**. The Bankruptcy Administrator is directed to appoint a chapter 7 trustee to administer the estate and perform the duties set forth in 11 U.S.C. § 704. In order to allow the Chapter 7 Trustee time to evaluate pending matters, the Clerk of the Court is hereby directed to schedule a hearing on Debtor's Objection to Arogeti's Proof of Claim and the Debtor's Application to Employ Jarvis Consulting within sixty (60) days of the entry of this Order. Furthermore, the Clerk of the Court is directed to set a pre-trial conference in Adversary Proceeding 08-00212-8-RDD within thirty (30) days of the entry of this Order.

    **SO ORDERED**.

**END OF DOCUMENT**